J-S18034-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE SUPERIOR COURT OF |
| | :       PENNSYLVANIA |
| | : |
| v. | : |
| | : |
| | : |
| | : |
| I-KEEM DAMONT FOGAN | : |
| | : |
| Appellant | : No. 1638 MDA 2025 |

Appeal from the PCRA Order Entered November 3, 2025
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s): CP-41-CR-0001303-2019

BEFORE: DUBOW, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:           **FILED: JULY 24, 2026**

I-Keem Damont Fogan ("Appellant") appeals from the order denying his petition for relief filed under the Post Conviction Relief Act ("PCRA").[1] Appellant argues that the PCRA court erroneously denied his claims seeking a new trial due to the ineffective assistance of counsel. We affirm.

We set forth the basic history of this case in our decision affirming Appellant's judgment of sentence as follows:

> At trial, the Commonwealth presented evidence that [Appellant] and Noah Stroup robbed a Uni-Mart in August 2019. Surveillance cameras captured the robbery on video. [Appellant] entered the Uni-Mart with a firearm, and grabbed a customer as she was leaving the store ("Customer"). [Appellant] dragged Customer up to the cash register. [Appellant] then pointed the firearm at the store cashier ("Cashier") and demanded money, but after Cashier pushed [Appellant's] hand away, [Appellant] shot Cashier in the

---

[1] 42 Pa.C.S. §§ 9541-9546.

chest. [Appellant] proceeded to shoot Customer in the chest, and fled the scene.

Cashier suffered serious injuries but survived. Customer, meanwhile, died at the scene of the robbery. [Appellant] was eventually arrested and charged with homicide, attempted homicide, robbery and several other offenses.

*Commonwealth v. Fogan*, 67 MDA 2022, 2023 WL 1794257 (Pa. Super. filed Feb. 7, 2023) (unpublished memorandum).

Appellant was convicted of, *inter alia*, homicide in the first degree, and sentenced to the mandatory term of life imprisonment without parole. Appellant did not seek further review with our Supreme Court and commenced timely PCRA proceedings on February 8, 2024. Appointed counsel filed an amended petition and the PCRA court held a hearing, at which trial counsel, Nicole Spring, Esq., testified. The court denied relief on November 3, 2025, and Appellant filed a timely notice of appeal. Appellant filed a Pa.R.A.P. 1925(b) statement as ordered, and the PCRA court issued an opinion on December 3, 2025. Appellant presents four issues for our review.

A. The [PCRA c]ourt erred in failing to grant a new trial when trial counsel was ineffective in failing to object when the Commonwealth's Attorney discussed applicable penalties with the jurors during *voir dire* which claim the trial court deemed merited and found involved the ineffective assistance of counsel, concluding incorrectly that the error was harmless despite its inestimable prejudice on [Appellant's] right to a fair trial.

B. The [PCRA c]ourt erred in failing to grant a new trial when trial counsel was ineffective in failing to object to Commonwealth witness narration of key events depicted in surveillance videos when the witness had no first hand knowledge and the events did not require opinion testimony resulting in the jury rendering a verdict based on witness interpretation of the evidence, not their own personal examination.

C. The [PCRA c]ourt erred in failing to grant a new trial when trial counsel provided ineffective assistance by failing to object to Detective Peacock's opinion testimony surrounding how long a white plastic bag and latex gloves were exposed to the elements when this information was key to the Commonwealth's case.

D. The [PCRA c]ourt erred in failing to grant a new trial when trial counsel was ineffective in failing to object to testimony elicited by the Commonwealth's Attorney establishing [Appellant] had prior criminal convictions which claim the trial court deemed merited and found involved the ineffective assistance of counsel, concluding incorrectly that the error was harmless despite the introduction of evidence of [Appellant's] prior criminal conduct being presented as substantive evidence of his guilt of the present charges.

Appellant's Brief at 4.

Our standard of review from an order denying PCRA relief "is limited to examining whether the evidence of record supports the court's determination and whether its decision is free of legal error." **Commonwealth v. Beatty**, 207 A.3d 957, 960-61 (Pa. Super. 2019). "The PCRA court's factual findings are binding if the record supports them, and we review the court's legal conclusions *de novo*." **Commonwealth v. Prater**, 256 A.3d 1274, 1282 (Pa. Super. 2021) (citation omitted).

All of Appellant's claims challenge trial counsel's stewardship. We review such claims pursuant to the following well-settled principles.

Counsel is presumed effective. To succeed on a claim asserting the ineffective assistance of counsel, as is raised here, a petitioner must rebut that presumption by pleading and proving, by a preponderance of the evidence, three elements: (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice as a result of counsel's action or inaction. If a petitioner fails to satisfy any one of the three elements, her claim fails.

- 3 -

*Commonwealth v. Rizor*, 304 A.3d 1034, 1051 (Pa. 2023) (citations omitted). Prejudice is "measured by whether there is a reasonable probability the result of the proceeding would have been different." *Commonwealth v. Knight*, 348 A.3d 1155, 1166 (Pa. Super. 2025) (quotation marks and citation omitted).

<u>Jury selection</u>

Appellant's first claim centers on the jury selection process. The assistant district attorney informed the prospective jurors, "This is not a death penalty case, so if anyone has that type of ethical concern, please understand that it is not in play, that is not part of this. Sometimes we get responses on the sheets, the questionnaire having to do with that." N.T., 9/20/21, at 71. Appellant alleges that he is entitled to a new trial based on Attorney Spring's failure to object to this comment.

Beginning with the arguable merit prong of the ineffectiveness test, Appellant argues that this statement conflicted with caselaw. In *Shannon v. United States*, 512 U.S. 573 (1994), the United States Supreme Court addressed "whether federal district courts are required to instruct juries with regard to the consequences of [a not guilty by reason of insanity (NGRI)] verdict." Under a federal statute, defendants deemed NGRI are held in custody pending a hearing, after which "the court determines whether the defendant should be hospitalized or released." *Id.* at 579. Shannon, who raised the affirmative NGRI defense, requested that the jury be informed of those consequences to ensure the jury knew a favorable verdict would not

result in his immediate release into the community. In analyzing Shannon's claim, the high Court summarized the different roles served by juries and judges.

> It is well established that when a jury has no sentencing function, it should be admonished to "reach its verdict without regard to what sentence might be imposed." *Rogers v. United States*, 422 U.S. 35, 40... (1975). The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion. *See Pope v. United States*, 298 F.2d 507, 508 (CA5 1962); *cf. Rogers, supra*, 422 U.S., at 40 ... .

*Id.* at 579.

Turning to Pennsylvania law, Appellant cites *Commonwealth v. Sattazahn*, 952 A.2d 640, 666 (Pa. 2008), a capital case, in which the trial court "advised the jurors, prior to their guilt-phase deliberations, concerning the specific punishments [Sattazahn] could receive for each degree of criminal homicide for which he was charged." Sattazahn, citing *Shannon* and other cases, argued that this "instruction infused the deliberative process with extraneous and prejudicial concerns, thus creating an unacceptably high risk that the jurors would return a verdict based, not on the facts, but rather, on their visceral sense of what the appropriate punishment should be." *Id.* at 666-67.

The Court rejected Sattazahn's claim. First, the Court addressed a pre-*Shannon* decision, *Commonwealth v. Yarris*, 549 A.2d 513, 526 (Pa. 1988), a capital case in which the jury was told "of the sentences applicable to first, second and third degree murder." Yarris apparently objected, but at his request the trial court "also instructed the jury not to consider the penalties in its deliberation as to the degree of guilt." *Id*. *Yarris* concluded that "knowledge of the severity of the penalties could serve only to caution a jury as to the seriousness of a conviction" and the instruction was thus permissible. *Id.* The *Sattazahn* Court "recognize[d] that the logic of *Shannon* would be in tension with the application of *Yarris* to a non-capital case" insofar as *Yarris* could be read to endorse a policy of always informing the jury of the potential penalties. In any event, *Sattazahn* pointed out that *Shannon* did not apply "since the general federal rule discussed there disfavoring the dissemination of sentencing information to jurors is expressly limited to circumstances in which 'a jury has no sentencing function.'" *Id.* (quoting *Shannon*, 512 U.S. at 579).

While the two cases are not directly on point, Appellant reasons that *Sattazahn*, by acknowledging the logic of *Yarris* would not extend to a non-capital case like this one, holds that it is prejudicial to inform juries of the potential penalties in non-capital cases. *See* Appellant's Brief at 12 ("[T]he prohibition against dissemination of sentencing information set forth in *Shannon* and affirmed by the Pennsylvania Supreme Court in *Yarris* and

*Sattazahn* is[] expressly limited to circumstances in which a jury has no sentencing function.") (quotation marks and citation omitted).

The PCRA court concluded that Appellant satisfied the first two prongs of the test for ineffective assistance of counsel[2] but ultimately concluded that Appellant could not establish prejudice. "First and foremost, the jury needed to be informed that this was not a death penalty case due to [Appellant's] statements that were admitted at trial." PCRA Court Opinion ("PCO"), 7/18/25, at 10.[3] The PCRA court explained that the Commonwealth introduced a statement Appellant made during transport from a hearing, wherein Appellant "spontaneously asked Agent Jeremy Brown what the means of death was in Pennsylvania." *Id.*[4] Thus, "to avoid confusing or misleading the jury, the jury would have to be told that this case was not or was no longer a death penalty case and to not concern themselves with penalty." *Id.* at 11.

Second, the PCRA court cited the trial court's closing instructions, which included the following: "In arriving at a verdict, you should not concern yourselves with any possible future consequences of your verdict, including

---

[2] The PCRA court held an evidentiary hearing. Attorney Spring testified that, as to all four claims, her failure to object was not a matter of strategy.

[3] The PCRA court's formal opinion was filed on December 2, 2025, and directed this Court to the July 18, 2025, order and opinion issued following the conclusion of the PCRA evidentiary hearing, which was styled as a notice of intent to dismiss. For ease of reference, we refer to that document as the PCRA court opinion.

[4] The parties stipulated that the magistrate district judge who arraigned Appellant would testify that it was his practice to inform defendants facing homicide in the first degree that the penalty is life imprisonment or death.

what the penalty might be if you should find the defendant guilty. The question of guilty [*sic*] and the question of penalty are decided separately." N.T., 9/27/21, at 128. Relatedly, if counsel had objected to the prosecutor's comment the court "would have informed the potential jurors to ignore the prosecutor's comment and instructed the potential jurors that they should not concern themselves with any possible future consequence of their verdict, including what the penalty might be[.]" PCO at 12.

Finally, the PCRA court concluded that Appellant failed to establish prejudice due to the strength of the evidence establishing Appellant's guilt.[5] *Id.* at 18 (finding that "there is not a reasonable probability that the outcome of the proceedings would be different if trial counsel had objected to the prosecutor's statement during jury *voir dire*").

Appellant posits that the comment risked confusing the jury, as recognized by **Shannon**. Appellant's Brief at 11. Additionally, he argues that the statement "minimized the seriousness of the conviction by setting forth that [Appellant] did not face the most severe penalty possible," thereby causing prejudice. **Id.**

Appellant rejects the PCRA court's analysis examining prejudice with reference to matters occurring at trial, as he concludes that the prejudice was "complete" even before the jury was selected. He asserts that the "entire jury pool was subjected to information that has been held to create a strong

---

[5] We summarize this evidence in our analysis of Appellant's fourth issue.

possibility of confusion and that trial counsel provided ineffective assistance in failing to correct that error. These events indicate [Appellant] suffered prejudice." *Id.* at 14. Similarly, addressing the PCRA court's point that the evidence presented at trial included Appellant asking about how the death penalty is imposed, and that the jury was instructed that it should not "concern yourselves with any possible future consequences of your verdict," N.T., 9/27/21, at 128, Appellant responds that "[n]either mitigates the jurors being told on their first day in court that this case was not as serious as it could be and that their guilty verdict would not expose [Appellant] to the most serious penalties associated with a murder offense." Appellant' Brief at 14; *id.* at 15 (arguing that the "jury was exposed to information about the penalties … prior to the commencement of his trial" and that this "information remained unchecked in each juror's mind throughout the eight (8) day trial").

While not using the phrase, Appellant's arguments invoke the concept of structural error. In *Chapman v. California*, 386 U.S. 18, 23 (1967), the United States Supreme Court declined to hold that all errors of a constitutional dimension automatically result in a new trial on appeal. The *Chapman* Court recognized, however, that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Id.* at 23. "These errors came to be known as structural errors." *Weaver v. Massachusetts*, 582 U.S. 286, 294 (2017).

The *Weaver* Court explained that there are "at least three broad rationales" for deeming an error structural, one of which is "if the effects of

the error are simply too hard to measure." *Id.* at 295. This is Appellant's fundamental theory, as he maintains that "prejudice is impossible to quantify[.]" Appellant's Brief at 14. He cites the "above rulings," *i.e.*, *Shannon*, *Yarris*, and *Sattazahn*, and submits that these cases "indicate that exposing a jury to sentencing information when that jury has no sentencing function is in and of itself prejudicial to the defendant on trial." *Id.* Appellant therefore concludes that the error is *per se* prejudicial and warrants a new trial.

Although our analysis departs from that of the PCRA court in some respects, we agree that Appellant has failed to meet his burden of showing prejudice.[6] First, Appellant misconstrues the applicable law, as he argues that the "United States Supreme Court cautions against the use of harmless error to dismiss errors otherwise apparent from the record," and notes that the "Commonwealth has the burden of proving harmless error beyond a reasonable doubt." *Id.* at 16. Appellant inverts the burden of proof. Our Supreme Court has explained the difference between proceedings on direct review, where harmless error applies, versus collateral review:

---

[6] We accept for purposes of our disposition that the asserted right not to have the jury consider the possible penalties in non-capital cases qualifies as a constitutional, structural error. However, we note that the language in *Shannon* on which Appellant relies was not grounded in any constitutional provision and instead reflected federal norms. *See Shannon*, 512 U.S. at 575 ("[W]e consider whether a federal district court is required to instruct the jury … either under the Insanity Defense Reform Act of 1984 or as a matter of general federal practice."); *Sattazahn*, 952 A.2d at 667 (recognizing that *Shannon* discussed a "general federal rule").

- 10 -

> [T]he test for prejudice in the ineffectiveness context is more exacting than the test for harmless error, and the burden of proof is on the defendant, not the Commonwealth. ...
>
> [The harmless error] standard ... is a lesser standard than the [collateral] prejudice standard, which requires the defendant to show that counsel's conduct had an actual adverse effect on the outcome of the proceedings. This distinction appropriately arises from the difference between a direct attack on error occurring at trial and a collateral attack on the stewardship of counsel.

*Commonwealth v. Spotz*, 84 A.3d 294, 315 (Pa. 2014) (citations and quotation marks omitted). This is not a mere academic distinction. "As a general and practical matter, it is more difficult for a defendant to prevail on a claim litigated through the lens of counsel ineffectiveness, rather than as a preserved claim of trial court error." *Id. Accord Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) ("Surmounting *Strickland*'s[7] high bar is never an easy task."). We would be justified in denying relief based on this failure alone, as Appellant's argument proceeds from the premise that the Commonwealth must show that the error was not harmless beyond a reasonable doubt and thus fails to meet his burden. *See Commonwealth v. Natividad*, 938 A.2d 310, 321 (Pa. 2007) ("Appellant, however, fails to recognize that, as the appellant, he is challenging the PCRA court's finding that he did not satisfy his burden of proof. Because courts must presume that counsel was effective, it is the petitioner's burden to prove otherwise.").

---

[7] *Strickland v. Washington*, 466 U.S. 668 (1984) (establishing the constitutional framework for establishing prejudice for violations of the Sixth Amendment right to effective counsel).

We nevertheless decline to do so, as we readily apprehend Appellant's core claim that he established "inestimable prejudice on [Appellant's] right to a fair trial." Appellant's Brief at 10. Charitably extending this argument to invoke the structural error concept, we note that the *Weaver* Court assumed for purposes of its disposition that relief must be granted on collateral review for a structural error "if the convicted person shows that attorney errors rendered the trial fundamentally unfair." *Weaver*, 582 U.S. at 300.[8] We glean from Appellant's brief an argument that the prosecutor's comment caused a fundamentally unfair trial by tainting the jury pool.

_____

[8] The *Weaver* Court "assume[d] that [Weaver's] interpretation of *Strickland* is the correct one" without deciding the point. *Weaver*, 582 U.S. at 300. Three Justices rejected that possibility. *Id.* at 306 (Thomas, J., concurring) ("*Strickland* did not hold, as the Court assumes, that a defendant may establish prejudice by showing that his counsel's errors rendered the trial fundamentally unfair."); *id.* at 309 (Alito, J., concurring) ("To sum up, in order to obtain relief under *Strickland,* Weaver must show that the result of his trial was unreliable. He could do so by demonstrating a reasonable likelihood that his counsel's error affected the verdict. Alternatively, he could establish that the error falls within the very short list of errors for which prejudice is presumed."). Justice Gorsuch joined both opinions.

We note that our Supreme Court granted allowance of appeal in *Commonwealth v. Santiago*, 349 A.3d 389 (Pa. Nov. 13, 2025) (*per curiam*), on two questions, the second of which is:

Under *Weaver* ... does a claim of ineffectiveness of counsel concerning the alleged structural error require: (1) any showing of prejudice; (2) a conventional showing of prejudice, i.e., a reasonable probability that, but for counsel's act or omission, the outcome of the proceeding would have been different; or (3) a showing that the error rendered the trial fundamentally unfair?

- 12 -

We do not agree with Appellant's analysis. Appellant argues that (1) the comment "create[d] a strong possibility of confusion" and (2) the jurors were primed not to pay careful attention during trial because the comment "reduc[ed] the seriousness of a conviction" since jurors knew that Appellant was not subject to death. Appellant's Brief at 11, 17. We are unpersuaded by either theory. The "confusion" possibility was raised in **Shannon**, which cited **Pope v. United States** for that principle. The **Pope** Court stated:

> To inform the jury that the court may impose minimum or maximum sentence, will or will not grant probation, when a defendant will be eligible for a parole, or other matters relating to disposition of the defendant, tend to draw the attention of the jury away from their chief function as sole judges of the facts, open the door to compromise verdicts and to confuse the issue or issues to be decided.

**Pope v. United States**, 298 F.2d 507, 508 (5th Cir. 1962).

While we agree with the PCRA court that the better practice is to refrain from such commentary unless an individual juror raises a particular concern,[9] we reject Appellant's argument that the comment in this case caused an unfair trial. Informing the jury pool that the Commonwealth was not seeking the death penalty merely told them that the most severe punishment was not on the table. Any "confusion" was minimal because the comment did not go on to inform the pool what the sentencing options would be if Appellant were found guilty. Furthermore, even if we grant that the jurors kept the comment

---

[9] "[I]f the juror responded [with] a concern about the death penalty, the court (and not the prosecutor), should be the one telling the potential juror that he or she would not have such a concern in this particular case." PCO at 9-10.

in mind over the eight-day trial, the fact remains that the jury was told during closing instructions not to consider possible punishments. **See Commonwealth v. Hairston**, 84 A.3d 657, 666 (Pa. 2014) ("Jurors are presumed to follow the trial court's instructions."). Accordingly, we presume that the jurors would not have considered the punishment issue at all during deliberations, thus eliminating the problems discussed in **Pope**.

This leaves Appellant's theory that he received an unfair trial because the comment minimized the seriousness of a conviction. As the vast majority of trials do not involve the death penalty, we are confident that jurors both realize that fact and take their duties seriously. We therefore agree with the PCRA court that Appellant failed to establish prejudice.

<u>Testimony regarding surveillance videos</u>

Appellant's second claim faults trial counsel for failing to object to the testimony of Detective Trent Peacock, who was asked by the prosecutor to narrate surveillance videos. During the presentation of the surveillance video from the Uni-Mart, Detective Peacock stated, "you can clearly see that the suspect" pointed a gun, pulled the hammer back, fired, and then fired a second time. **See** N.T., 9/22/21, at 20-21. Next, when the Commonwealth played surveillance video from the automotive shop showing an individual fleeing from the Uni-Mart, Detective Peacock testified that the video shows "an individual in dark top and light color pants" running west. **Id.** at 24. This testimony circumstantially linked Appellant to the recovery of items from the nearby hillside.

Appellant argues that "whether the person depicted in the Uni[-]Mart surveillance video cocked the hammer of the gun and whether the individual depicted later ran away in a particular direction were significant issues" at trial. Appellant's Brief at 18. He argues that trial counsel ineffectively failed to object to this testimony on the grounds that Detective Peacock was not qualified as an expert.

> Detective Peacock was questioned about his experience with the operation of firearms, but was not admitted as an expert, and counsel for [Appellant] notes that the testimony elicited by the Commonwealth regarding both the Uni[-]Mart surveillance video and the automotive shop's surveillance video was not admitted as expert testimony[,] explaining events that a lay person would not understand. Instead, Detective Peacock testified to visible physical events that were depicted on surveillance videos played for the jury. Events that any person observing the videos would be in an equal position to comprehend and evaluate. Detective Peacock was not present in the Uni[-]Mart at the time of the offense nor did he observe first hand any of the events depicted in the Martino's Automotive surveillance video.

Appellant's Brief at 18.

Appellant avers that an objection to Detective Peacock's narration would have succeeded under Pennsylvania Rule of Evidence 701, relating to opinion testimony by lay witnesses, and Rule 901, regarding authentication. *Id.* at 18-19. As to prejudice, Appellant argues that the jury "render[ed] a verdict based on witness interpretation of the evidence, not their own personal examination." *Id.* at 17. Thus, Appellant submits that the failure to object caused the jury to give undue emphasis to Detective Peacock's opinion.

As a threshold matter, we note that Appellant's authenticity argument is inapposite. Rule 901 requires the proponent to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901. The "item" in question here is the surveillance videos themselves; authenticity issues would pertain to things like whether the cameras were working properly, whether their timestamps were accurate, and whether the stored video data had been tampered with or modified. Rule 901 has no bearing on whether Detective Peacock's testimony was "authentic" in the sense it was an accurate, description of the videos' content. We therefore do not address that component of Appellant's argument.

Turning to that narrative testimony, Appellant argues that Detective Peacock "stood equal with the jurors in that he was not present when the events depicted in the two ... videos occurred and therefore had no firsthand knowledge of those events that would have assisted jurors in understanding what they were seeing." Appellant's Brief at 21. Because Detective Peacock was not qualified as an expert, Appellant maintains that his opinion of what the videos showed would be barred by Pa.R.E. 701, governing opinion testimony by lay witnesses:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

We conclude that Appellant cannot establish prejudice.[10] The cited passages from the transcript show that Detective Peacock did not claim that **Appellant** was the person depicted on the videos, and thus we cannot agree that the jury was unduly swayed by the narration.[11] The detective's testimony

_____

[10] The PCRA court concluded that Detective Peacock's narration of the Uni-Mart video was helpful to the jury on the grounds that it helped "the jury to clearly understand that the handgun possessed by the shooter was a revolver and what it takes for a revolver to fire." PCO at 21. Appellant responds that the operation of a firearm requires expert testimony and is thus not subject to Rule 701. Because we conclude Appellant was not prejudiced in any event, we opt to proceed directly to that prong. **See Commonwealth v. Tharp**, 101 A.3d 736, 747 (Pa. 2014) ("A court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; instead, if a claim fails under any necessary element of the ineffectiveness test, the court may proceed to that element first.").

[11] "Concededly, the division whether testimony constitutes fact or opinion may be difficult, for 'there is no litmus test for fact versus opinion.'" **Commonwealth v. Palmer**, 192 A.3d 85, 100 (Pa. Super. 2018) (quoting **Bucchianeri v. Equitable Gas Co.**, 491 A.2d 835, 839 (Pa. Super. 1985)). In **Palmer**, the lead detective "testified that he identified the shooter by finding and watching the video surveillance of the shooting, then examining earlier portions of the video for other instances where the suspect appeared." **Id.** at 100–01. We held that the trial court did not err in overruling an objection to the detective's narration, as the non-expert testimony was relevant to explain the basis for the Commonwealth's investigation. We added that the jury was free to reject the detective's testimony:

> Furthermore, we note that the videos had little relevance if [Palmer] was not the person appearing at the times highlighted by the Commonwealth. The jury was obviously aware that the Commonwealth believed that the person was [Palmer], and it was the jury's duty to determine if the Commonwealth proved that fact

*(Footnote Continued Next Page)*

was simply describing what the video showed. As the Commonwealth points out, Appellant "did not allege in his PCRA petition that the detective misrepresented anything during his narration at trial." Commonwealth's Brief at 6. His brief likewise does not claim that anything Detective Peacock said was inaccurate. Therefore, even if trial counsel had sought to exclude the narration on the grounds that the jury was equally able to determine what the videos showed, that failure did not prejudice him. To the extent his testimony touched on expert opinion issues with respect to the operation of the firearm, there is no dispute that the video depicted the shootings. *See* PCO at 21 ("[E]ven without Agent Peacock's testimony, the jury could see that the individual shot the Clerk and the Customer."). Thus, that failure was likewise not prejudicial.

### Opinion testimony regarding items found during the investigation

Appellant's third claim pertains to Detective Peacock's testimony that law enforcement officials recovered "a white plastic bag ... consistent with what the suspect was holding in his left hand at the time of the robbery, and that bag was clean, had obviously not been out in the weather any amount of time." N.T., 9/22/21, at 23. Additionally, officers recovered latex gloves on

---

beyond a reasonable doubt. The jury itself watched the videos, and was free to reach a different conclusion if it disagreed with Detective Wearing's conclusion that it was [Palmer] depicted on the video at specific moments in the footage.

*Id.* at 101. The same logic applies here.

a hillside. Detective Peacock stated that "obviously somebody slid down over the hillside, and right here are ... latex gloves ... they were about 10 feet up the hillside." *Id.* at 30. The detective opined that the gloves "were relatively clean, had not been weathered and laying out in the weather for any period of time." *Id.*

Appellant argues that Rule 701, discussed *supra*, does not authorize Detective Peacock's testimony because a "lay person is unable to render an opinion on when plastic materials would begin to show signs of environmental degradation as this is not within the knowledge of a lay person." Appellant's Brief at 23. Thus, he avers that trial counsel ineffectively failed to object to that opinion testimony. We endorse the PCRA court's conclusion that this claim lacks arguable merit and adopt it as our own:

> The testimony regarding the lack of dew or the cleanliness of the gloves and bag was based on the personal perceptions or observations of the law enforcement officers that discovered them. It was helpful to the jury's understanding of the officer's testimony and helpful to the jury determining whether a fact in issue, more specifically whether the items were left by the perpetrator in the Uni-Mart incident. It was not based on scientific, technical or specialized knowledge. Agent Peacock did not testify about the chemical composition of the items or how long it would take plastic or latex to break down. He testified about common sense information possessed by the general public and reasonable inferences to be drawn from that information. A person need not be a weatherperson to testify that that the street wasn't went before s/he went inside and it was wet after s/he came back outside; therefore, it rained. The information provided by Agent Peacock was similar. It is common knowledge that items that have been left outside gather dust, dirt[,] and dew. The longer that they are left outside, the more weathered they appear. Therefore, this testimony was not improper.

PCO at 25-26.

<u>References to criminal history</u>

Appellant's fourth and final claim concerns the testimony of Agent Jeremy Brown, who testified that a probation officer and his department's chief of police identified Appellant as the individual depicted on one of the videos. N.T., 9/22/21, at 138. Trial counsel did not object.

Appellant cites **Commonwealth v. Allen**, 292 A.2d 373, 374 (Pa. 1972), wherein "the trial court permitted several of the Commonwealth's witnesses to make references to the fact that the police had shown [mugshots] of [Allen] to the alleged eyewitnesses." The Court held that "the controlling question is whether or not a juror could reasonably infer from the facts presented that the accused had engaged in prior criminal activity." **Id.** at 375. The Court then granted a new trial because "the constant mention of photographs during direct examination permitted the jury to infer that [Allen] had a prior criminal record. The prejudice thus created requires that the conviction be set aside and that a new trial be granted." **Id.** at 376 (footnote omitted). We continue to apply this test. **Commonwealth v. Young**, 849 A.2d 1152, 1156 (Pa. 2004) ("[I]t is only those references that expressly or by reasonable implication also indicate some involvement in prior criminal activity that rise to the level of prejudicial error.").

We agree that the reference to the probation department and the chief of police's familiarity with Appellant reasonably conveyed to the jury that

Appellant had "prior criminal activity." However, we do not agree that Appellant is entitled to relief.

First, "[m]ere passing references to criminal activity will not require reversal unless the record indicates that prejudice resulted from the reference." *Commonwealth v. Blystone*, 725 A.2d 1197, 1204–05 (Pa. 1999). The cases therefore do not presume prejudice in the sense that a mistrial is required—or a new trial if the trial court declines to grant a mistrial and the issue is pursued on direct review—simply because the jury knows that the defendant had "prior criminal activity." In cases where trial counsel objects, a curative instruction may be sufficient, as set forth by our decision in *Commonwealth v. Maute*:

> Additionally, the possible prejudicial effect of a witness' reference to prior criminal conduct by the defendant may, under certain circumstances, be removed by a cautionary instruction. *Commonwealth v. Richardson*, [437 A.2d 1162, 1165 (Pa. 1981)]. In *Richardson*, our Supreme Court held that the trial court properly refused to grant a mistrial when a defense witness testified on cross-examination to prior unrelated criminal conduct by the defendant. In so holding, the Court focused on the nature of the remark, the fact that the remark was not deliberately introduced or exploited by the Commonwealth, and the prompt curative instruction given by the trial court. In the instant case, equally strong factors compel the same result. [Maute's] own counsel accidentally elicited the objectionable testimony. The remark was isolated and was not repeated or otherwise emphasized. Moreover, unlike the remark in *Richardson*, the instant comment did not refer to specific criminal conduct. Accordingly, any prejudice which may have resulted could have been remedied by a curative instruction.

*Commonwealth v. Maute*, 485 A.2d 1138, 1143 (Pa. Super. 1984).

Here, the remark was not elicited by counsel, but the references were isolated and Appellant does not cite any subsequent mention of prior criminal activity or exploitation of the statement by the Commonwealth. Additionally, the comment did not reference any specific criminal conduct or conviction. Thus, had counsel objected, a curative instruction may have sufficed. We do not necessarily agree that a mistrial would have been required, or that a preserved objection would have resulted in a new trial on appeal.

We need not decide that point, however, because we conclude that Appellant cannot establish prejudice. Unlike this case, **Allen** arose on direct review. As discussed in the first issue, on collateral review an appellant bears the burden of proving **Strickland** prejudice. We therefore examine whether the evidence overwhelmingly established Appellant's guilt. **Blystone**, **supra** at 1205 ("[A]s indicated in this Court's direct review of this matter, there was overwhelming evidence of guilt presented against [Blystone]. Accordingly, it cannot be said that counsel's failure to seek remedial measures in response to the witness' reference to [his] previous involvement with the justice system prejudiced appellant.").

We agree with the PCRA court that the evidence was overwhelming, as summarized herein. Investigators obtained video from the Uni-Mart and a nearby business, Martino's Automotive. The Uni-Mart video "showed the suspect wearing latex gloves, distinctive clothing (a brown, hooded sweatshirt with a pattern and logo or insignia; and gray Nike sweatpants with a black diagonal pattern on the thighs), white Adidas sneakers, and carrying a white

plastic bag." PCO at 13. The automotive shop's camera "showed an individual in a dark top and light pants like the suspect's run across the intersection[.]" *Id.*

Officers searched the area near the automobile shop and found "latex gloves and clothing consistent with that worn by the suspect ... on the hillside in the area behind that residence." *Id.* Appellant's "DNA was the major component and DNA from at least two other individuals were in the minor components" found on the latex gloves and a bracelet that were contained in the same evidence envelope. *Id.* at 14.

Officers also found gray sweatpants and a brown sweatshirt. The sweatpants were tested and Appellant's "DNA was the major component and DNA from at least two other individuals were in the minor components." *Id.* The sweatshirt had "a unique pattern and logo consistent with the one worn by the shooter as depicted in the video surveillance from the store." *Id.* at 15. The Commonwealth presented evidence establishing Appellant discarded his clothes after the shooting, as later that evening Appellant "was caught on camera on the porch of a residence in his underwear. … He was in a state of undress and carrying a garbage can." *Id.* An eyewitness saw a man "running down the street clothed only in underwear and carrying a garbage can." *Id.* "In a prison phone call, [Appellant] admitted he was walking in the area without any clothes shortly after incident." *Id.* at 16.

Authorities arrested Appellant "approximately one and one-half days after the incident. His cell phone was on his person and seized incident to his

arrest." *Id.* at 17.   A search warrant uncovered text messages between Appellant and Stroup "discussing their plans to rob that particular Uni-Mart." *Id.*   Stroup testified at trial, stating that he was the look-out and remained outside while Appellant robbed the store.   "Stroup was captured on the video surveillance outside the store. He was wearing a distinctive black jacket[.]" *Id.*

This evidence overwhelmingly establishes Appellant's guilt.  Accordingly, Appellant cannot establish he was prejudiced by references to his prior criminal activity.

Order affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>7/24/2026</u>